## WEBER v. KAVANAGH, Collector of Internal Revenue.

### No. 3626.

District Court, E. D. Michigan, S. D.

Nov. 9, 1943.

Race, Haass, Allen & Brewer and Hugh W. Allin, all of Detroit, Mich., for plaintiff.

John C. Lehr and Arnold W. Lungerhausen, both of Detroit, Mich., and George J. Laikin, of Washington, D.C. (Samuel O. Clark, Jr., and Andrew D. Sharpe, both

of Washington, D.C., on the brief), for the Government.

LEDERLE, District Judge.

### Findings of Fact.

1. This is a suit for recovery of income taxes paid by plaintiff, William C. Weber, a resident of Detroit, Michigan, to the defendant, Giles Kavanagh, Collector of Internal Revenue for this District, upon an allegedly erroneous deficiency assessed by the Commissioner of Internal Revenue on plaintiff's 1929 income tax return.

2. On March 13, 1930, plaintiff filed with defendant Collector his income tax return for the calendar year 1929, on Form 1040, wherein plaintiff claimed and took as a deduction, his net loss for 1927 as shown by his 1927 tax return, in the sum of $73,305.-02, and his net loss for 1928 as shown by 1928 tax return, in the sum of $54,036.33. Plaintiff's 1929 tax return thereby showed a net loss of $50,077.88.

3. On August 25, 1931, the Internal Revenue Agent in charge at Detroit proposed to disallow the deductions taken in the 1929 tax return for the net losses shown by the 1927 and 1928 return as aforesaid. On January 5, 1932, the Commissioner of Internal Revenue, by registered mail, notified plaintiff of an additional tax of $9,657.93 assessed against him by reason of the aforesaid disallowance. This sum, together with accrued interest, was paid as follows:

| October 10, 1939 | $3,035.00 |
| October 23, 1939 | 5,000.00 |
| March 30, 1940 | 50.00 |
| June 22, 1940 | 25.00 |
| February 11, 1941 | 4,305.43 |
| April 25, 1941 | 4,578.13 |

making a total of $16,993.56.

4. On October 9, 1941, plaintiff filed his claim for refund of taxes and interest paid as aforesaid by reason of said disallowance of deductions and subsequent assessment. This claim for refund was disallowed on April 15, 1942, and this suit was instituted on December 29, 1942.

5. The net loss carryover deductions were disallowed and the additional tax assessed on the ground that the plaintiff was not engaged during 1927 and 1928 in the operation of a trade or business regularly carried on within the meaning of Section 117 of the Revenue Act of 1928, 26 U.S.C. A. Int.Rev.Acts, page 388.

6. Plaintiff taxpayer, William C. Weber, was born in Detroit in 1856, and became self-supporting about 1876. For a period of approximately five years he worked at various jobs on salary, and finally took a position as clerk for C. L. Ortman, of Saginaw, Michigan, who was engaged in the occupation of buying and selling timber lands. Mr. Weber remained with Mr. Ortman and his successors until about 1884, at which time he acquired the business then being carried on by them. Mr. Weber was precipitated into the business world while in high school because of his father's financial reverses during the panic of 1873, his earliest financial dealing on his own account being the borrowing of $1500 from his employer, Mr. Ortman, to pay an obligation of his father's. Taxpayer has never inherited any money or property.

Prior to 1884, Mr. Weber bought on his own account certain lands for the purpose of resale, and from 1884 to the present time has been engaged in buying and selling lands and interests therein, principally in the State of Michigan and the Province of Ontario, Canada, including particularly the selling of the right to cut timber therefrom.

Up to the present time Mr. Weber has purchased in excess of 215,000 acres of land, the bulk of which he has resold. Of these 215,000 acres, about 150,000 acres were purchased prior to 1900. From 1900 to 1915 various sections, being 640 acres each, were purchased. The largest single purchase during the 1920's was 2000 acres, the balance of purchases during this period being smaller blocks and parcels for "grouping-up" purposes. At present taxpayer still retains title to some 15,000 acres of timber lands and an additional 15,000 acres of cutover lands.

From 1920 to 1929 taxpayer's gross receipts from rentals of land and sales of standing timber, mineral rights and fee title to land reached an aggregate of $798,-561.63. Approximately two-thirds of these receipts were payments made by various parties for the right to cut and remove timber from lands owned by plaintiff. Since 1900 plaintiff's basic sales were as follows:

In 1903, a large tract including mineral rights, surface and timber rights;

In 1905, surface and timber rights only in a tract, the right to mineral deposits being reserved;

In 1907, surface and timber rights only in a tract, the right to mineral deposits being reserved;

In 1911, surface and timber rights only in a tract, the right to mineral deposits being reserved;

In 1920, only the right to cut timber in a tract, surface and mineral rights being reserved;

In 1929, a full fee title to a large tract in Canada;

In 1938, surface and timber rights only in a tract, the right to mineral deposits being reserved;

In 1939, surface and timber rights only in a tract, the right to mineral deposits being reserved.

7. Mr. Weber's sole means of livelihood from 1884 to the present time has been the income realized from his transactions in lands. His initial purchase of land, many subsequent purchases, and many endeavors connected with his lands have been financed with money borrowed by him. An example of the extent of this method of financing his land activities appears from interest payments reported in his three income tax returns in question, namely, 1927 —$9222.31; 1928—$17,702.18; 1929—$21,-694.89. That is, for each of the three years in question, he paid an average of $16,-206.00 interest on loans to finance his land activities.

8. Mr. Weber's main method of operation has been, by a series of purchases, some large and some small, to acquire substantial contiguous holdings in various localities, and then find purchasers therefor and negotiate sales thereof. In disposing of his properties, it has been his custom, when possible, to first sell cutting rights to persons engaged in the business of logging timber lands. Such cutting rights might be the subject of one, two, three or four sales. Mr. Weber also has made exhaustive investigations of mineral possibilities in his various holdings, and, in addition to doing some development work himself, has made leases to mining companies, who generally paid him in royalties. The field of customers interested in, and able to handle, the necessarily large enterprises involved in lumbering and mining operations is very limited. When lands on which he has been able to sell only timber rights are no longer valuable for this purpose, Mr. Weber has subdivided them, and then sold them, by land contract or otherwise, in tracts of forty to one hundred sixty acres, for farming purposes, often reserving mineral rights for future sale.

9. Mr. Weber has always maintained an office in a separate room of his home for the transaction of his land business, in which he kept his equipment, files, maps, books, etc., having value in respect to these activities. Since 1908, Mr. Weber has been assisted in his land activities by his son, Harry Weber, who, in addition to making land transactions in his own right, has assisted his father in the various activities connected with his lands and kept his father's voluminous records. Mr. Weber's records consist of an original land book covering the period from 1877 to 1910, containing separate sheets for each purchase, showing the source of title, a description of the land, the payment of taxes during the years owned, sales of cutting and other rights and the ultimate disposition of the land. Since 1910, this single record has been broken down into three volumes, one of which is a complete record of taxes owing and paid, and the other two are large bound books containing pages approximately eleven by sixteen inches, showing the nature and source of title, a description of the property, transactions with respect to the property, such as offers and sales of cutting rights and other interests therein, actions taken to perfect and clear title, and the ultimate disposal of the property.

10. During the period from 1884 to this time, Mr. Weber personally, and since 1908 with the assistance of his son, has been regularly and continuously engaged in negotiating purchases and sales of his property, and in this regard has carried on a voluminous correspondence, both for the purpose of acquiring information and for the purpose of conducting negotiations. Mr. Weber's correspondence approximates one thousand letters per year written by him.

11. In acquiring information with respect to his lands, Mr. Weber from time to time employed the services of expert timber estimators, commonly called "timber cruisers". As an instance of the volume of this work, during the years 1910 to 1929, Mr. Weber had 2904 parcels of land cruised. In his 1928 tax return two expense deductions were: "Paid for services rendered in 1928, $4070.48; Paid for supplies to estimating crew in 1928, $529.03." In addition to acquiring the expert advice of timber cruisers, who are also a source of information to Mr. Weber as to prospective purchasers, he made frequent trips to the areas in which he owned lands for

the purpose of inspecting his holdings and ascertaining who his neighboring owners and, consequently, prospective customers, were, and entering into negotiations with them.

12. Another ramification of taxpayer's activities in connection with his various properties, necessitated by the nature and extent thereof, has been inspections of the land, by taxpayer, his son, and his timber cruisers, to keep himself apprised of the current condition of the properties he was offering for sale, and ascertaining if there had been trespass by squatters or unauthorized persons cuttting his timber or encroaching on his mineral rights, or damage to the timber by fire or otherwise. Upon discovery of trespass, taxpayer has endeavored to ascertain the party responsible, enforced cessation of the trespass by negotiation or attornment of squatters, if possible, by suit if necessary, and collected for the damage in the same manner. Discovery of damage to the timber has called for the location of a lumberman so that the timber could be cut and disposed of forthwith as a salvage and preservative measure, because damaged timber is especially susceptible to rapid deterioration by rot, worms, and other natural causes.

13. During the years in question, and for many years prior thereto, Mr. Weber used a letterhead which read, "William C. Weber, Dealer in Lands, Detroit, Mich." In connection with his dealings in lands, Mr. Weber acquired and prepared numerous maps on which he spotted his own holdings and those of abutting or neighboring owners, which he used in negotiating sales. He also acquired and prepared maps showing all owners in various localities, for the purpose of determining who his prospective customers would be. In this regard, he has had occasion to acquire and use some two hundred fifty separate maps, plotting various holdings and other information thereon, most of which have been of continuous utility in his land activities up to the present time. He also has numerous blue prints of plats and properties in which he has holdings.

14. During the period from 1910 to 1929, Mr. Weber issued one hundred thirty contracts with respect to his holdings, including deeds, grants of cutting rights, grants of mineral rights, leases, and other documents. In addition to hiring legal assistance in this regard, the Messrs. Weber themselves developed and prepared many of the form documents they use to accomplish their special purposes.

15. Mr. Weber has continuously during each of the years from 1884 to date, held himself out as a dealer in lands, and all of the property which he has acquired has been for the purpose of resale for profit. Sales were made of any interest in lands for which a customer would pay, and the interest sold was based upon the customer's needs. Mr. Weber, therefore, sold full fee title, timber rights only, surface and timber rights reserving minerals, surface only, or minerals only, whichever was most profitable. Portions for which a customer would not pay, were reserved, offered for sale, and sold, by Mr. Weber when a new customer was found.

16. As heretofore pointed out, plaintiff originally handled all of his activities in person, but in 1908 his son started to work with him. The son was not considered as an employee and was not paid a regular salary; but the Messrs. Weber put their respective funds into a common till, and each drew what he needed therefrom. The timber cruisers, appraisers, geologists, and attorneys, who were engaged from time to time were not paid salaries as employees, but upon a fee or contract basis. Plaintiff was not a licensed real estate broker, and he never represented others in purchases or sales of real estate, but did at times engage brokers to assist in sales of his own land. During the period from 1920 to 1929, he paid such real estate brokers $34,000 as commissions for sales of his property.

17. In each of the years in question, 1927 through 1929, taxpayer reported his receipts as "income from business or profession," detailing his receipts and disbursements in typewritten riders.

18. Taxpayer's return for 1929 shows a profit of $221,115 on the sale of 130.94 acres of land in the Township of Malden, Canada, purchased in two parcels in April and July, 1913; a profit of $3762 on the sale of about half an acre of land in Sandwich, Canada, for the opening of a street, which he had purchased with other lands in 1890; a rental income of $700. Taxpayer's books reflect the renting from 1921 through 1929 of various tenant farms in Canada, at yearly rentals varying from $75 to $375 each. Taxpayer's 1929 return also reported income of $2510.53, without profit, from Michigan mining royalties; payment on a

1927 contract for sale of a Urania, La., oil lease; and a sale in 1929 of timber rights on 240 acres of land in Michigan, 80 acres of which he had purchased in 1922 and 160 acres of which he had purchased with other lands in 1912. The reported consideration received by him for this 1929 sale of timber rights was $1000 cash and a deed to 160 acres reserving timber rights to the grantor.

In addition to the disallowed net loss carryover from 1927 and 1928, the following deductions were taken and allowed for 1929:

| | |
|---|---|
| Taxes paid in 1929 (on lands which he held for sale) | $94,736.21 |
| Interest paid in 1929 (to finance his land activities) | 21,694.89 |
| Business expenses in 1929 | 11,335.34 |
| Schulenburg oil exploration loss | 20,881.99 |

The reported explanation of business expenses was as follows:

| | | |
|---|---|---|
| Business trips in 1929 cost | $ | 106.61 |
| Attorney fees paid in 1929 | | 6,715.92 |
| Paid for services rendered in 1929 | | 473.91 |
| Paid for photostats and blueprints in 1929 | | 120.55 |
| Paid for business photographs in 1929 | | 101.50 |
| Paid for phone and repairs on premises leased to my tenant in 1929 | | 47.48 |
| Paid for subscriptions to business papers 1929 | | 27.50 |
| Paid for reports and recording in 1929 | | 517.89 |
| Paid for maps in 1929 | | 37.00 |
| Paid for toll telephone and telegraph in 1929 | | 76.63 |
| Paid bonuses for loans | | 2,975.00 |
| Paid for office supplies, stamps, vault, rent, etc. | | 135.35 |
| Total | | $11,335.34 |

The reported explanation of the oil exploration loss was as follows:

"William C. Weber took leases at Schulenburg, Texas, and drilled for oil, no oil was found; total cost of leases, expenses, exploration, and rentals was $21,602.08, credit $720.09 for sale of derrick, net loss $20,881.99. All leases are now ended and total investment is a loss."

19. Taxpayer's return for 1928 shows a receipt of interest on bank balances and taxes refunded of $699.07, rents collected $400, and profit of $406.50 on sales of land and timber. This last item was explained as: A profit of $325 on the sale in 1928 of timber on 40 acres of land, which with other lands had been bought in part in 1884 and the balance prior to 1913; a profit of $75 on the sale in 1928 of 5⅞ acres of land, which with other lands had been bought prior to 1913; a profit of $6.50 on the sale in 1928 of his 1/16 share of the timber on 40 acres of land, which had been bought prior to 1913 with other lands and interests therein. He also reported receiving in 1928, without profit, $1613.77 royalty on a mining lease.

Taxpayer's 1928 return reported and took the following deductions:

| | |
|---|---|
| Taxes paid in 1928 (on lands which he held for sale) | $32,041.09 |
| Interest paid in 1928 (to finance his land activities) | 17,702.18 |
| Expenses of business in 1928 | 5,798.63 |

The reported explanation of business expenses was as follows:

| | | |
|---|---|---|
| Business trips in 1928 cost | $ | 131.20 |
| Attorney fees paid in 1928 | | 617.01 |
| Paid for services rendered in 1928 | | 4,070.48 |
| Paid for supplies to estimating crew in 1928 | | 529.03 |
| Paid for photostats and blueprints in 1928 | | 105.10 |
| Paid for phone on premises leased to my tenant | | 21.55 |
| Paid for subscriptions to business papers 1928 | | 22.50 |
| Paid for reports and recordings in 1928 | | 77.50 |
| Paid repairs and insurance on farm leased by me to tenant | | 100.20 |
| Paid for office supplies, stamps, vault rent, etc. | | 66.35 |
| Paid telephone toll calls and telegraph | | 57.71 |
| Total | | $5,798.63 |

20. Taxpayer's return for 1927 shows a receipt of interest on contracts and bank balances of $703.49, profit on sales of land and timber of $1521.06, rents collected of $337.53, royalty of $149.31 on a mining lease without removal of ore and an additional payment of $466.10 royalty, without profit, for ore mined under the lease.

Taxpayer's 1927 return reported and took the following deductions:·

| | |
|---|---:|
| Taxes paid in 1927 (on lands which he held for sale) | $61,977.38 |
| Interest paid in 1927 (to finance his land activities) · | 9,222.31 |
| Expenses of business in 1927 | 4,220.18 |
| Loss in Urania Oil Well | 596.54 |

The reported explanation of business expenses was as follows:

| | |
|---|---:|
| Business trips in 1927 | $ 63.55 |
| Attorney fees paid in 1927 | 3,105.23 |
| Paid for ·services rendered | 181.45 |
| Paid for blueprints and photostats | 83.08 |
| Paid phone on premises leased to my tenant | 20.83 |
| Paid for subscriptions to business papers | 27.00 |
| Paid for telephone toll calls and telegraph | 55.82 |
| Paid for vault and typewriter rent · | 30.00 |
| Paid repairs and insurance on farm leased by me to tenant | 290.63 |
| Paid for office supplies and miscellaneous expenses | 109.48 |
| Paid for preparing subdivision plans | 253.11 |
| Total | $4,220.18 |

21. Taxpayer's document register, among other things, reflects an exclusive sales agency agreement entered into by him on January 22, 1927, whereby he agreed to subdivide into lots and plat property owned by him in Canada, which the sales agents agreed to sell for a total price of $69,000, taxpayer to establish specified building restrictions and pay 1927 taxes and expenses connected with the subdividing. This register also reflects two notices under such agreement, on July 30, 1927, whereby taxpayer raised the price of the lots and required that they be paid for in cash, and, further, that on March 26, 1928, the sales agreement was cancelled. This register further reflects an agreement entered into by taxpayer on May 23, 1928, whereby he acquired an easement to float timber products from his lands in Michigan through the Dead River Storage Basin, hoist same out along the shore, bank them and remove them therefrom.

22. As taxpayer's sole occupation and means of livelihood during the years in question, he regularly and continuously engaged, and held himself out as engaging, for profit, in buying primarily for the purpose of sale, and selling, interests in real estate, together with some development and renting thereof, to which activities taxpayer devoted substantially all of his time and efforts.

23. Taxpayer's aforesaid activities constituted "the operation of a trade or business regularly carried on" during the years in question, for which this Court can find no better designation than that used by taxpayer for many years, namely, "Dealer in Lands", and not speculation or mere managerial attention to investments for the conservation and enhancement thereof.

## Conclusions of Law.

■ 1. This is a suit for recovery of income taxes paid by plaintiff to defendant Collector under an allegedly erroneous assessment, and, as such, is an action arising under a law providing for internal revenue, over which this court has jurisdiction. 28 U.S.C.A. § 41(5).

■ 2. The plaintiff's ·claim for refund having been filed within two years after payment of the taxes in question, the same was timely. 26 U.S.C.A. Int.Rev.Code, § 322(b) (1).

■ ·3. Claim for refund having been denied eight months before institution of this suit, plaintiff met the necessary prerequisites to maintenance of this action. 26 U.S.C.A. Int.Rev.Code, § 3772.

■ 4. The finding of the Commissioner is prima facie correct, and the burden is upon a contestant to disprove it. Avery v. Com'r, 5 Cir., 22 F.2d 6, 55 A.L.R. 1277.

■ 5. "Every deduction from gross income is allowed as a matter of legislative grace, and 'only as there is clear provision therefor can any particular deduction be allowed. * * * A taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms.'" White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 184, 83 L.Ed. 172; Wilcox v. Com'r, 6 Cir., 119 F.2d 899.

■ 6. "To determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case." Higgins v. Com'r, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783.

■ 7. Where it affirmatively appears, as here, that during the years in question

a taxpayer, as his sole occupation and means of livelihood, to which he devotes substantially all his time and effort, regularly and continuously engages, and holds himself out as engaging, for profit, in buying primarily for the purpose of sale, and selling, interests in real estate, together with some development thereof, his activities constitute "the operation of a trade or business regularly carried on", rather than speculation or mere managerial attention to investments for the conservation and enhancement thereof, and he is within the provision permitting carryover and deduction, from profits realized in 1929 mainly from a large sale of real estate in the operation of such business, of net losses resulting from the operation of such business in 1927 and 1928. Sects. 117 and 23(i), Revenue Act of 1928, 26 U.S.C.A. Int.Rev. Acts, pages 388, 357; Higgins v. Com'r, supra; United States v. Wooten, 5 Cir., 132 F.2d 400; Ross v. Com'r, 3 Cir., 125 F.2d 767, certiorari denied 316 U.S. 685, 62 S.Ct. 1279, 86 L.Ed. 1757; Wilcox v. Com'r, supra.

8. It therefore follows that the findings of the Commissioner must be reversed and judgment entered for the amount of plaintiff's deficiency payments with interest namely, $20,371.53.